# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2350

_____

United States of America,

        Appellee,

v.

David Wilcox,

        Appellant.

\* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the
District of South Dakota.

_____

Submitted: December 12, 2006
Filed: May 29, 2007

_____

Before BYE, COLLOTON, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

A jury convicted David Wilcox of sexual abuse of a minor, D.T., in violation of 18 U.S.C. §§ 2242 and 2243. On appeal, Wilcox challenges the sufficiency of the evidence against him, the process for selecting the jury that convicted him, several of the district court's evidentiary rulings, the jury instructions, the reasonableness of the sentence imposed, and the court's award of restitution to D.T.'s mother. We affirm Wilcox's conviction but vacate a portion of the restitution award and remand for imposition of a corrected sentence.

## I.

The indictment charged that Wilcox committed acts of sexual abuse on August 19, 2005. At that time, D.T. was fourteen years old, and Wilcox was eighteen. D.T. lived with her mother, Melissa, and other family members in a small, two-bedroom cabin in Wanblee, South Dakota, on the Pine Ridge Indian Reservation. Wilcox lived with his grandparents a block away.

Wilcox and Melissa were cousins, and Wilcox was a regular guest at her cabin. Wilcox also knew D.T. fairly well. On the night before the incident that gave rise to the criminal charges, Wilcox visited Melissa's cabin, leaving around midnight. At approximately 3:45 a.m., Melissa left for work at a hog farm thirty miles away. Wilcox returned to the cabin shortly thereafter, while D.T. and her younger brother were alone at the residence.

Wilcox testified that he had been out late and was worried about upsetting his grandparents by returning home at such an hour. Thus, he decided to "crash" at Melissa's cabin. He entered the cabin, walked to the bedroom, woke D.T., and spoke with her briefly. D.T. then fell back asleep, and Wilcox laid down on the bed next to her.

D.T. testified that sometime later she awoke to find Wilcox on top of her. Her pants and panties had been removed. She felt something in the "bottom part" of her body that she used to go to the bathroom, and Wilcox's "lower part" made her "hurt inside." (T. Tr. at 181-82). She pushed Wilcox away, went to the bathroom, wrapped a towel around herself, and turned on hot bath water because she felt "dirty." (*Id.* at 182, 300). She then grabbed the telephone and struggled for it with Wilcox, who told her not to call anyone. After several minutes, Wilcox tired of the struggle and left the cabin. D.T. called her mother's workplace, but was unable to reach her and left a message. She then called the police, and an officer arrived sometime later.

At trial, Wilcox gave a different account of events, portraying himself as the victim and D.T. as the sexual aggressor. He claimed that he awoke and was surprised to find someone on top of him, her "bottom part" rubbing his "part" for thirty seconds, although he acknowledged that he had an erection and that brief penetration had occurred. Because it was dark, he said he did not realize immediately who was on top of him, but when he discovered it was D.T., he asked her, "What's going on?", and she jumped off. (*Id.* at 275). He then stood around in shock, but he conceded that he struggled with D.T. in an effort to prevent her from making a telephone call. Eventually, he gave up and returned to his home, where he remained until a police officer arrived. Wilcox has since retracted this story, admitting at sentencing that his trial testimony was a fabrication and that he did sexually abuse D.T. in the early morning hours of August 19, 2005.

Melissa testified that on the morning of August 19, she received word at the hog farm that something was amiss at her home. She called the cabin and spoke to D.T., who told her that Wilcox had been on top of her and had "hurt" her. Melissa then left the farm and rushed back to the cabin, where D.T., D.T.'s sister, and Melissa's mother were waiting for her. Melissa comforted D.T. and took her to the Wanblee clinic, arriving before the clinic had opened. After speaking with a nurse, D.T. and Melissa were transported by ambulance to the Pine Ridge Hospital, where D.T. was examined.

Wilcox was charged with two counts of sexual abuse. Count I charged Wilcox with engaging in a sexual act with D.T. when she was "physically incapable of declining participation in, or communicating unwillingness to engage in, that act," as prohibited by 18 U.S.C. § 2242(2). Count II charged him with sexual abuse of a minor in violation of 18 U.S.C. § 2243(a). Wilcox pled not guilty and successfully moved to suppress his underwear. The underwear had been seized by a tribal police officer, and laboratory analysis determined that it contained D.T.'s vaginal fluid. Wilcox was then tried by a jury, which convicted him on both counts.

At sentencing, the district court initially determined that Wilcox had an offense level of 32 and a criminal history category of I under the United States Sentencing Guidelines. After Wilcox admitted his guilt during the sentencing hearing, however, the court granted him a reduction for acceptance of responsibility. *See* USSG § 3E1.1(a). This reduced his offense level to 30 and resulted in an advisory guideline range of 97 to 120 months. The court then imposed a sentence of 110 months, explaining that it was imposing a sentence in the middle of the guideline range, rather than at the bottom, because of Wilcox's initial dishonesty and because he had forced D.T. to endure the trauma of a trial. The court also awarded Melissa $5,678.70 in restitution under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, for lost wages and the costs of transporting D.T. to healing ceremonies. Wilcox appeals the convictions, the term of imprisonment, and the restitution award.

II.

Wilcox argues that there was insufficient evidence to convict him. When reviewing this claim, "we view the evidence in the light most favorable to the verdict, and we will overturn a conviction only if no reasonable jury could have concluded that the defendant was guilty beyond a reasonable doubt on each essential element of the charge." *United States v. Kenyon*, 397 F.3d 1071, 1076 (8th Cir. 2005) (internal quotation omitted).

Wilcox was convicted of sexual abuse under 18 U.S.C. §§ 2242 and 2243, both of which require proof that a "sexual act" occurred. The sexual act charged was contact between the penis and the vulva, which "occurs upon penetration, however [ ] slight." 18 U.S.C. § 2246(2)(A). Wilcox contends that evidence of penetration was absent and that there was thus insufficient evidence to prove sexual abuse.

We disagree. Wilcox's own testimony provides sufficient evidence of penetration. During cross-examination, the government specifically asked Wilcox,

"Your penis was in her vagina, correct, thirty seconds?", and Wilcox responded, "Yes." (T. Tr. at 299). The government again asked if his penis was "inside it," and Wilcox said, "It was out, rubbed it, touched it." (*Id.*). The prosecution continued, "Then it was inside thirty seconds, correct?", to which Wilcox replied that it had been "[n]ot that long" but only "about ten, five [seconds]." (*Id.*). In addition to this clear evidence of penetration, D.T. testified that when she awoke to find Wilcox on top of her, she felt something in the "bottom part" of her body that she used to go to the bathroom and that "it hurt inside" and later bled. (*Id.* at 181, 188). She claimed that Wilcox's "lower part" caused this pain inside her. (*Id.* at 181-82). Thus, the jury had sufficient evidence to conclude that penetration occurred.

Wilcox further asserts that the jury lacked sufficient evidence to convict him under 18 U.S.C. § 2242, which makes it unlawful to engage in a sexual act with a person "physically incapable of declining participation in, or communicating unwillingness to engage in, that act." 18 U.S.C. § 2242(2)(B). Here too, the jury had sufficient evidence to convict Wilcox. A reasonable jury may conclude that a person who is asleep when a sexual act begins is physically unable to decline participation in that act. *United States v. Barrett*, 937 F.2d 1346, 1347-48 (8th Cir. 1991). D.T.'s testimony that she awoke with Wilcox on top of her and feeling pain inside of her "bottom part" provided sufficient evidence for the jury to conclude that penetration occurred while she was asleep.

Wilcox also contends that the district court erred by denying his challenge to the government's peremptory strike of a Hispanic venireperson. Wilcox objected to the strike, and after the government explained its reasons for making the strike, the court overruled Wilcox's objection. We review the district court's decision for clear error. *United States v. Hunt*, 372 F.3d 1010, 1012 (8th Cir. 2004).

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that a state prosecutor who uses peremptory challenges to exclude prospective jurors because of

their race violates the defendant's right to equal protection of the laws. *Id.* at 96-98. We have applied *Batson* to the federal government through the Due Process Clause of the Fifth Amendment. *United States v. Elliot*, 89 F.3d 1360, 1364 n.3 (8th Cir. 1996). In considering a *Batson* challenge, the district court should use a sequential process to determine whether such an unconstitutional strike has taken place. *Batson*, 476 U.S. at 96-98. First, a defendant must make a *prima facie* case of racial discrimination. If the defendant does so, the government then has the burden of providing a race-neutral explanation for its peremptory strike, which the defendant may attempt to show to be a pretext. Finally, the trial judge determines whether the defendant has proven that the strike was motivated by purposeful discrimination. *United States v. Roebke*, 333 F.3d 911, 913 (8th Cir. 2003).

In this case, the district court ruled that even if Wilcox had made a *prima facie* case of racial discrimination, the government offered sufficient race-neutral reasons to defeat his *Batson* challenge. Most prominent among these reasons was the prospective juror's prior conviction for assault. That a prospective juror has a criminal record is a proper race-neutral reason for striking the venire member. *United States v. Crawford*, 413 F.3d 873, 875 (8th Cir. 2005). Wilcox made no showing that the government was using the prospective juror's conviction as a pretext for purposeful discrimination. The district court's finding that the strike was motivated by race-neutral reasons was not clearly erroneous.

## III.

Wilcox appeals several evidentiary rulings. We review the district court's interpretation and application of the rules of evidence *de novo* and review the evidentiary rulings for abuse of discretion. *United States v. Kenyon*, 397 F.3d at 1079.

## A.

Wilcox argues that the district court erred by admitting a recording of D.T.'s telephone call to the police department, in which D.T. stated that "David" had been on top of her. The prosecution played the recording for the jury during the trial, and gave the jury a transcript of the conversation to review while the tape was played. Wilcox contends that the court erred by admitting the tape and allowing the jury to view the transcript, because D.T.'s recorded statements were impermissible hearsay.

The court admitted the recording as evidence that Wilcox committed the alleged crimes, so D.T.'s recorded statements were offered "to prove the truth of the matter asserted," and they are therefore hearsay. *See* Fed. R. Evid. 801(c). D.T.'s statements were admissible, however, under the excited utterance exception to the hearsay rule. Fed. R. Evid. 803(2).

An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* To determine whether a declarant was still under the "stress of excitement caused by an event" when a statement was made, we consider "the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement." *United States v. Clemmons*, 461 F.3d 1057, 1061 (8th Cir. 2006). We also examine whether the declarant's stress or excitement was continuous from the time of the event until the time of the statements. *United States v. Marrowbone*, 211 F.3d 452, 455 (8th Cir. 2000). Accordingly, we have admitted evidence of a telephone call made to report a crime shortly after it occurred, where the declarant sounded very upset, and the circumstances of the crime were such that an ordinary person would have been startled. *United States v. Phelps*, 168 F.3d 1048, 1055 (8th Cir. 1999).

Here, D.T.'s testimony, buttressed by Wilcox's account of the event, established that she called the police department shortly after the sexual abuse. After the abuse and before making any calls, D.T. picked up a towel, turned on the bath water, and struggled with Wilcox for the telephone. D.T. testified that it took her a "second" to get the towel and a "couple minutes" to turn on the bath water, and that Wilcox prevented her from making a call for roughly ten minutes after she first picked up the telephone. She also described a brief interruption by her little brother, a call to her mother in which she left a message, and a task of looking up the police department's telephone number before she made the call. This testimony establishes that D.T. called the police at her first opportunity and that only a brief period of time passed between the abuse and her call to the police. Evidence of her continuous excitement is borne out in the recording of the telephone call itself; Wilcox admits that D.T. was crying and that her voice sounded noticeably upset. (T. Tr. at 302). The district court did not abuse its discretion in concluding that D.T. was still under the stress of excitement caused by the abuse when she made the call, and the evidence was properly admitted.

Wilcox also objected to the use of the transcript of this recording. The transcript was not admitted into evidence, but the court allowed the jury members to review the transcript while the recording was played. So long as transcripts are accurate, they may be used by the jury as an aid in considering a recording. *United States v. Delpit*, 94 F.3d 1134, 1147-48 (8th Cir. 1996). Wilcox does not contend that the transcript was inaccurate, and the court did not abuse its discretion by allowing the jury to use it.

Wilcox further argues that the district court should have excluded hearsay testimony offered by Melissa, D.T.'s mother. Melissa testified that on the morning of the abuse, she called home after a co-worker alerted her that something was amiss. She then spoke to D.T., who, while crying, told Melissa that "David" had been on top of D.T. when she awakened and that he had hurt her. Wilcox objected to these

statements as inadmissible hearsay, and the court overruled the objection. We conclude that these statements also were admissible as excited utterances.

Melissa's testimony suggests that she spoke with D.T. soon after D.T. called the police department. Mary Forney, who answered D.T.'s call to the police department, testified that D.T. called the department at roughly 6:45 a.m. Melissa testified that a co-worker informed her that she needed to call home at roughly 6:45 a.m., and that she eventually spoke to D.T. by telephone early in the morning. This timing is consistent with D.T.'s account, since D.T. testified that she left a message for her mother at the hog farm before calling the police. Melissa then walked a quarter-mile to the farm's office and called home, at which time she spoke to D.T. Thus, the district court reasonably could conclude that Melissa's testimony places her conversation with D.T. shortly after D.T.'s call to the police, that D.T.'s demeanor evidenced stress and excitement, and that no appreciable amount of time had passed since the startling event of sexual abuse. We conclude that the district court did not abuse its discretion by concluding that the statements were admissible as excited utterances.

Wilcox appeals the admission of another portion of Melissa's testimony. At trial, Melissa testified that she and D.T. moved out of their house soon after the abuse, because D.T. "cannot be in the house or anything around it." (*Id.* at 125). Wilcox objected that this response was irrelevant, but the objection was overruled. We hold that the district court did not abuse its discretion by ruling that this evidence was relevant. Wilcox attacked D.T.'s credibility by implying that she initiated sexual contact with Wilcox. If the jury believed that Melissa and D.T. moved out of their house after the date of the alleged abuse because of the trauma felt by D.T., that fact tended to rebut the assertion that D.T. was the sexual aggressor and to make it more probable that the abuse actually occurred. *See* Fed. R. Evid. 401.

B.

When cross-examining D.T., Wilcox's counsel asked her whether she had a boyfriend at the time of the abuse. D.T. answered that she did not, but this answer was stricken after the court sustained the government's objection. Wilcox contends that this ruling was error. His theory is that if D.T. did not have a boyfriend at the time of the abuse, then she might have been infatuated with Wilcox, thereby lending support to Wilcox's later testimony that D.T. had initiated the sexual contact.

The asserted relevance of this evidence rests on the supposition that D.T.'s lack of a boyfriend increased the likelihood that D.T. was infatuated with Wilcox. This supposition has no support in the record. Wilcox himself admitted at trial that D.T. had never shown any interest in him. Because discussion of D.T.'s dating habits was potentially prejudicial and had little or no probative value, the court did not abuse its discretion in sustaining the objection and striking D.T.'s response. *See* Fed. R. Evid. 403.

Wilcox also appeals the district court's denial of his motion for a continuance. Wilcox had subpoenaed Annette Stands to testify as a witness for the defense. Stands was the ambulance driver who drove D.T. and Melissa from the Wanblee clinic to the Pine Ridge Hospital on the morning of the abuse. According to Wilcox's counsel, Stands would have testified that during the drive to the hospital, Melissa was "boisterous, aggressive, loud, and basically assertive in nature, while [D.T.] simply did what her mother told her to do." (T. Tr. at 358). When Stands failed to appear, Wilcox moved for a continuance, arguing that Stands's absence was likely attributable to the weather. The court denied the motion, noting that Wilcox had several days' warning that a winter storm was coming, that the roads were still passable, and that Wilcox had not requested a material witness warrant.

-10-

The district court is afforded broad discretion when ruling on a request for a continuance. Continuances are generally disfavored and should be granted only if the moving party has shown a compelling reason. We will reverse a district court's denial of a continuance only if the court abused its discretion and the moving party was prejudiced as a result. *United States v. Controneo*, 89 F.3d 510, 514 (8th Cir. 1996).

We do not believe that the district court abused its discretion here. Stands's testimony was at most marginally relevant to the credibility of D.T. and Melissa. Moreover, during cross examination, Melissa already had acknowledged that she directed events relating to D.T.'s care after hearing of the abuse, and did not deny that she might have been "confrontational" when doing so. Thus, Stands's testimony would have been at least partially cumulative, and any remaining probative value was minimal. We see no prejudice to Wilcox, and the district court thus did not abuse its discretion by denying Wilcox's motion for a continuance.

Wilcox next contends that the district court impermissibly restricted the scope of his closing argument. A district court has broad discretion to limit the scope of closing arguments and "may prohibit arguments that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury." *Richardson v. Bowersox*, 188 F.3d 973, 979-80 (8th Cir. 1999) (internal quotations omitted). We review the district court's rulings for abuse of discretion. *United States v. Urbina*, 431 F.3d 305, 310 (8th Cir. 2005).

During his closing argument, Wilcox's counsel rhetorically asked the jury, "Did you hear medical evidence in this case? Was there semen? Was there blood?" (T. Tr. at 419). The government objected, arguing that because the medical evidence substantiating the sexual contact (i.e., Wilcox's underwear containing D.T.'s vaginal fluid) had been suppressed, counsel's implication that this evidence did not exist was misleading. The court sustained the objection, stating that counsel cannot refer to suppressed evidence.

-11-

We have located no precedent discussing the permissibility of the disputed argument. The exclusionary rule, of course, is designed to place the government in the same position it would have occupied absent police error or misconduct. *See Nix v. Williams*, 467 U.S. 431, 443 (1984). Wilcox contends that he should be free to argue that the government failed to adduce any medical evidence corroborating D.T.'s allegation of sexual contact, just as he could do if the government failed to discover the evidence. *E.g.*, *United States v. Thompson*, 37 F.3d 450, 454 (9th Cir. 1994). The government asserts that while application of the exclusionary rule allows Wilcox to benefit from the absence of the evidence, he should not be permitted to make an argument likely to mislead the jury. Because a jury may presume that the police naturally would have gathered Wilcox's underwear, the argument goes, the accused should not be allowed to suggest implicitly that the garment contained no incriminating evidence when everyone knows that it really did. We find it unnecessary to pass on the propriety of the district court's ruling, because we conclude that any error in foreclosing this argument was harmless. Wilcox admitted that he made sexual contact with D.T., and that the sexual contact included penetration. We are at a loss to see how Wilcox could have maintained that the absence of medical evidence showing D.T.'s vaginal fluid on Wilcox's underwear undermined the government's case, when he admitted both sexual contact and penetration in his own testimony. Wilcox was not prejudiced when the court prevented his counsel from making this argument.

Wilcox also complains that the district court excluded an argument by his counsel that "the third choice" available to the jury – i.e., convicting Wilcox of the lesser included offense of simple assault – had "the least ramifications to this young man." (*Id.* at 421-22). After the government objected, Wilcox's counsel added, "He has his entire life to lead yet." (*Id.* at 422). The court ruled that this argument was impermissible because it referred to the penalty Wilcox faced if convicted.

Details regarding potential punishment were irrelevant to the jury's duty to determine whether Wilcox should be convicted of the charged offenses. "To inform a federal jury about a defendant's punishment would only introduce improper and confusing considerations before it." *United States v. Thomas*, 895 F.2d 1198, 1200 (8th Cir. 1990). Wilcox's counsel sought to argue that the defendant should be convicted of simple assault rather than sexual abuse because the assault charge carried a lesser penalty. This argument sought to introduce an irrelevant consideration to the jury, and the district court did not abuse its discretion by sustaining the government's objection.

Wilcox also appeals the district court's instructions to the jury. The court took two of its instructions directly from the language of 18 U.S.C. § 2243. Section 2243 prohibits sexual contact with an individual who "has attained the age of 12 years but has not attained the age of 16 years," and who "is at least four years younger" than the person charged. 18 U.S.C. § 2243(a). The court, applying § 2243(d), instructed the jury that the government need not prove that Wilcox knew D.T.'s age or knew that she was four years younger than he was to find Wilcox guilty under § 2243. (Jury Instruction No. 4; T. Tr. at 382). Similarly, applying the affirmative defense of § 2243(c), the court instructed the jury that if Wilcox showed by a preponderance of the evidence that he reasonably believed that D.T. had attained the age of sixteen at the time of the abuse, then he was not guilty of violating § 2243. (Jury Instruction No. 5; T. Tr. at 383). Wilcox objected, arguing that these instructions impermissibly relieved the government of the burden of proving intent and thereby violated his right to due process under the Fifth Amendment and his "right to a fair trial" under the Sixth Amendment. The district court overruled the objections.

These jury instructions were taken directly from the statutory language, and the court properly applied the governing statutes. Wilcox contends, however, that the statutory provisions themselves are unconstitutional. We hold that they are not. "[S]tatutory rape is a recognized judicial exception to the general principle that

-13-

mistake of fact is a defense if it negatives the existence of a mental state essential to the crime charged." *United States v. Juvenile Male*, 211 F.3d 1169, 1170-71 (9th Cir. 2000) (per curiam) (internal quotation omitted); *see also Morissette v. United States*, 342 U.S. 246, 251 n. 8 (1952) (noting that common-law commentators recognized statutory rape as an exception to general principles of criminal intent). Accordingly, federal courts uniformly have rejected claims that the Constitution requires the government to prove that a defendant charged with statutory rape knew that the victim was underage, or that such a defendant has a constitutional right to the defense that he made a reasonable mistake as to the victim's age. *See Juvenile Male*, 211 F.3d at 1170-71; *United States v. Ransom*, 942 F.2d 775, 777 (10th Cir. 1991); *Nelson v. Moriarty*, 484 F.2d 1034, 1035-36 (1st Cir. 1973) (per curiam); *see also United States v. Mack*, 112 F.2d 290, 292 (2d Cir. 1940) ("[I]t is well settled in cases of rape that ignorance that the prosecutrix is below the age of consent is no excuse."). Seeing no reason to depart from this body of precedent, we likewise reject Wilcox's claim that the court's jury instructions violated his due process rights or any other constitutional right.

IV.

A.

Wilcox was sentenced to 110 months in prison. Based on an offense level of 32 and criminal history category of I, the court initially calculated his sentencing range under the advisory sentencing guidelines as 121 to 151 months' imprisonment. The court then granted Wilcox a two-level reduction for acceptance of responsibility under § 3E1.1 of the guidelines, because he admitted his guilt during the sentencing hearing. The reduction changed the advisory range to 97 to 121 months. The court told Wilcox that it would impose a sentence in the middle of this guideline range rather than at the bottom, because "you did not testify truthfully in trial, as you admitted here today, and because you made [D.T.] go through a trial." (S. Tr. at 73).

-14-

Wilcox argues his 110-month sentence is unreasonable with regard to 18 U.S.C. § 3553(a). "[W]e do not require a district court to categorically rehearse each of the section 3553(a) factors on the record when it imposes a sentence as long as it is clear that they were considered." *United States v. Dieken*, 432 F.3d 906, 909 (8th Cir. 2006). Here, the court not only stated that it had considered the § 3553(a) factors, but described why 110 months was an appropriate sentence under each factor. This explanation, although brief, is sufficient to demonstrate that the § 3553(a) factors were properly considered.

We reject Wilcox's claim that the court improperly ignored his age, lack of criminal history, reputation in the community, and cooperation with the court. The sentencing guidelines account for Wilcox's lack of a criminal history and his acceptance of responsibility. USSG § 3E1.1, § 4A1.1. The Sentencing Commission advises that a defendant's age generally should be irrelevant to sentencing. *Id.* §5H1.1. While the district court has authority after *Booker* to consider these factors apart from the guidelines, the court reasonably concluded in this case that the evidence did not warrant a non-guideline sentence for any of these reasons. The court addressed Wilcox's reputation at length, but found that if his reputation for truthfulness in the community had any bearing, it actually weighed against him. Wilcox may have influenced his family and friends to believe his original claim that D.T. had initiated the sexual contact, thereby hurting her reputation in the community. This conclusion was not unreasonable.

We also reject Wilcox's contention that the court gave undue weight to the guidelines. Sentences imposed within the guidelines are presumptively reasonable, *United States v. Lincoln*, 413 F.3d 716, 717 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 840 (2006), and Wilcox has not shown that the court improperly treated them as mandatory. Indeed, the court specifically referred to the guidelines as "advisory." (S. Tr. at 36).

Wilcox contends that the district court improperly penalized him for exercising his right to a jury trial when it cited his decision to proceed to trial as a reason for imposing a sentence above the bottom of the advisory guideline range. It is settled that a court, consistent with the Constitution, may grant leniency in return for a plea of guilty, and may withhold similar leniency from a defendant who proceeds to trial. *See Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978). Under the federal sentencing guidelines, for example, the Constitution does not forbid a court to withhold a reduction for acceptance of responsibility because the defendant proceeded to trial. USSG § 3E1.1, comment. (n. 2); *United States v. Smith*, 40 F.3d 933, 935-36 (8th Cir. 1994).

Consistent with these authorities, when a court reduces the advisory guideline offense level because the defendant accepted responsibility for the offense of conviction, the court may temper the extent of this reduction because the defendant went to trial. *United States v. Jones*, 997 F.2d 1475, 1478-80 (D.C. Cir. 1993) (en banc). By withholding a certain degree of leniency offered through the reduction for acceptance of responsibility, the court cannot be said impermissibly to "punish" the defendant for exercising his right to trial. *Id.* at 1479; *cf. United States v. Sales*, 725 F.2d 458, 460 (8th Cir. 1984) (reciting that a court "may not use the sentencing process to punish a defendant . . . for exercising his right to receive a full and fair trial").

In this case, the district court granted Wilcox a downward adjustment for acceptance of responsibility, even though he proceeded to trial, proclaimed his innocence, and sought to portray his minor victim as a sexual aggressor. The sentencing guidelines provide that the downward adjustment for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." USSG § 3E1.1, comment. (n.2). Many defendants who follow Wilcox's course of action receive no adjustment for

acceptance of responsibility, and instead receive an *upward* adjustment for obstruction of justice pursuant to USSG § 3C1.1. *E.g.*, *United States v. Thundershield*, 474 F.3d 503, 507-08 (8th Cir. 2007); *United States v. Cueva-Arrendondo*, 469 F.3d 712, 716 (8th Cir. 2006); *United States v. Denton*, 434 F.3d 1104, 1114 (8th Cir. 2006). The district court's decision to grant Wilcox some leniency under § 3E1.1, but to refrain from reducing the sentence to the bottom of the resulting guideline range was neither unreasonably harsh nor unconstitutional. Therefore, we affirm Wilcox's 110-month sentence.

B.

Finally, Wilcox appeals the district court's award of restitution to D.T.'s mother, Melissa, under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A. The district court ordered Wilcox to pay Melissa restitution of $5,678.70. Of this amount, the court awarded Melissa $4,957.80 under § 3663A(b)(2)(C) to reimburse her for lost income. The court awarded the remaining $720.90 to her under § 3663A(b)(2)(A) for the cost of transporting D.T. to "healing ceremonies." We consider *de novo* the court's interpretation of the statute, and review its restitution order for abuse of discretion. *United States v. Liner*, 435 F.3d 920, 926 (8th Cir. 2006).

We conclude that the district court erred by awarding Melissa restitution as a "victim" under § 3663A(b)(2)(C). While the statute defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," *id.* § 3663A(a)(2), the subsection concerning reimbursement for lost income refers to a specific victim: "[I]n the case of an offense resulting in bodily injury *to a victim* . . . [the defendant shall] reimburse *the victim* for income lost *by such victim* as result of such offense." 18 U.S.C. § 3663A(b)(2)(C) (emphases added). The use of the definite article indicates that "*the* victim" who may be reimbursed is the victim described at the beginning of the subsection – that is, the

victim who suffered bodily injury. *See United States v. McAlester-Edwards Coal Co.*, 262 U.S. 200, 208 (1923) (holding that where statute referred to "the appraisement," "the use of the definite article means an appraisement specifically provided for."); *Flandreau Santee Sioux Tribe v. United States*, 197 F.3d 949, 952 (8th Cir. 1999) ("The statute's use of 'the person' refers to someone specific"); *Webster's Third New International Dictionary* 2368 (2002) ("The[:] used as a function word to indicate that a following noun or noun equivalent refers to someone or something previously mentioned or clearly understood from the context of the situation"). Because only D.T., not Melissa, suffered bodily injury, Melissa is not a victim who may be reimbursed for lost income under § 3663A(b)(2)(C).

Another section of the restitution statute, § 3663A(a)(2), allows a victim's legal guardian to "assume the victim's rights under this section" if the victim is under eighteen years old. 18 U.S.C. § 3663A(a)(2). This provision does not support an award to Melissa based on Melissa's lost income. It simply provides that the court may order the defendant to pay to the legal guardian, rather than the victim herself, the restitution owed *to the victim*. The section does not allow the legal guardian to substitute her own losses for those of the victim. Under § 3663A(a)(2), Melissa may be reimbursed for any income that *D.T.* lost because of the sexual abuse, but not for income that Melissa herself lost.

It is not clear whether the district court believed that Melissa's loss of income proved that D.T. herself lost income as a result of the offense. *See* S. Tr. at 39 ("Melissa – as the victim, the mother can assume those rights for the victim. And I find that the victim by and through her mother has been directly and proximately harmed by this crime."). The government does not appear to advance this theory, relying instead on its argument that Melissa was a victim who may be reimbursed.

While the economic reality may be that a parent's loss of income to some extent flows through and impacts a dependent child, we do not believe the text of

§ 3663A(b)(2)(C) will support a finding that D.T. herself lost income in this case. Looking to tort law for guidance, *see United States v. Cienfuegos*, 462 F.3d 1160, 1163, 1165-66 (9th Cir. 2006), we note that, except in wrongful death cases, children generally cannot recover for income lost by their parents, regardless of the effect on their own economic welfare. For instance, a child usually has no right to recover for the "loss of support" she suffers when her parent is injured and cannot work. *See Bletcher v. Goins*, 400 S.E.2d 830, 842 (W. Va. 1990); *Lee v. Colorado Dept. of Health*, 718 P.2d 221, 233-34 (Colo. 1986); *Berger v. Weber*, 267 N.W.2d 124, 125 (Mich. Ct. App. 1978). *See also* Annotation, *Child's Right of Action for Loss of Support, Training, Parental Attention, or the Like, Against a Third Person Negligently Injuring Parent*, 11 A.L.R. 4th 549, § 2[a] (1982 & Supp. 2005). Similarly, while a parent can recover part of her lost income when missing work to care for an injured child, *see Fields v. Graff,* 784 F. Supp. 224, 226 (E.D. Pa. 1992); *Lester v. Dunn*, 475 F.2d 983, 985-86 (D.C. Cir. 1973); *see also* David W. Knotts, Annotation, *Valuing Damages in Personal Injury Actions Awarded for Gratuitously Rendered Nursing and Medical Care*, 49 A.L.R. 5th 685, § 6[a] (1997), the injured child typically cannot recover for such expenses unless the parent has assigned her right of recovery to the child or waived it. *See Betz v. Farm Bureau Mut. Ins. Agency of Kansas, Inc.*, 8 P.3d 756, 760 (Kan. 2000); *Garay v. Overholtzer*, 631 A.2d 429, 432-434, 440-46 (Md. 1993); *Roberts v. Sisters of St. Francis Health Serv.*, 556 N.E.2d 662, 671 (Ill. Ct. App. 1990); 67A C.J.S. Parent and Child § 331 (2007).

The Social Security Administration, in determining eligibility for disability benefits, does "deem" a certain percentage of a parent's income to be income of a dependent child. 42 U.S.C. § 1382c(f)(2)(A); 20 C.F.R. 416.1165 (2007). But this result is accomplished only through "deeming" – that is, by treating "something as if it were really something else," *Black's Law Dictionary* 425 (7th ed. 1999) (punctuation omitted), and the administrative practice thus fortifies our conclusion that Melissa's lost income is not really income lost by D.T. in the normal sense of the word. There may be good policy reasons for allowing a court to order reimbursement

of a parent's lost income – either by deeming some portion of the parent's income to be income of the child, or by recognizing the parent as a separate victim who may be reimbursed when a dependent suffers bodily injury – but we do not think the present statutory language encompasses that policy. *See Hughey v. United States*, 495 U.S. 411, 422 (1990) ("Even were the statutory language regarding the scope of the court's authority to order restitution ambiguous, longstanding principles of lenity, which demand resolution of ambiguities in criminal statutes in favor of the defendant, preclude our resolution of the ambiguity against petitioner on the basis of general declarations of policy in the statute and legislative history.") (citations omitted). Thus, we vacate the court's order awarding Melissa $4,957.80 for lost income under § 3663A(b)(2)(C).

We conclude that the court's award of $720.90 under § 3663A(b)(2)(A) was proper. Section 3663A(b)(2)(A) requires a defendant whose offense caused bodily injury to "pay an amount equal to the cost of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment." 18 U.S.C. § 3663A(b)(2)(A); *see United States v. Reichow*, 416 F.3d 802, 805-06 (8th Cir. 2005). Melissa may be awarded the restitution for the costs of D.T.'s treatment on D.T.'s behalf under § 3663A(a)(2). *See also United States v. Johnson*, 400 F.3d 187, 200 (4th Cir. 2005) (holding that when a party has paid treatment costs on the victim's behalf, that party may be awarded the victim's restitution for those costs).

Here, the court district found that "visits to a healer or medicine man" constituted "treatment" under § 3663A(b)(2)(A) and reimbursed Melissa $720.90 for the costs of transporting D.T. to these visits. Wilcox did not object to this award below, and he has not demonstrated that it is so obviously wrong (if wrong at all) that it constitutes plain error warranting relief. *See United States v. Olano*, 507 U.S. 725,

732 (1993).  We thus affirm the court's award of $720.90 for the costs of D.T.'s treatment.

* * *

For the foregoing reasons, we affirm Wilcox's conviction, uphold the term of imprisonment imposed, and sustain $720.90 of the court's restitution order.  We vacate the remainder of the restitution order, and remand for entry of an amended judgment.

_____

-21-